Good morning, Your Honors, and may it please the Court, my name is David Goldsmith. I'm here on behalf of the plaintiffs and the alleged class in this securities class action. Your Honors, this appeal arises on de novo review following the dismissal of our complaint on falsity and scienter grounds. Those are broadly the two issues that are before you this morning. Setting the stage, I'd like to mention that it's really indisputed in this case that in the Cupid I clinical trial, the patients who received the Mitocar heart failure treatment started off a lot more healthy, in fact, on seven of the eight measures of health than the patients who received the placebo. Also undisputed, Your Honors, is the fact that these what they called patient baseline imbalances created a serious and fundamental question as to whether the results of Cupid I on efficacy or the effectiveness of the Mitocar were reliable. Also undisputed, Your Honors, is the fact that Celladon sought to validate these efficacy results by running a sensitivity analysis post hoc, so after all the data was unblinded. Now, we allege, Your Honors, with specificity. Can I just ask you, didn't you leave out one additional undisputed fact that, in my view, sort of dooms your claim or claims, which is that all of what you just described was publicly disclosed? So what fraud was perpetrated on the investing public when these folks told everyone everything you just said? Well, there's a number of things that were not disclosed, so the next thing I was going to say, and then I will answer your question in detail, Judge Watford, I mean, what we allege with specificity is that the methodology for the sensitivity analysis was arbitrary and result-driven. But it was disclosed in that supplement, and I'm looking at it right here, everything you complain about in the complaint and in your brief, tell me if I'm wrong, because this is my assumption and this is what guides my preliminary view. Everything that you're complaining about in terms of the methodology, they explained exactly what they did. Now, you might disagree with it. You might say that, well, competent scientists certainly wouldn't think that that rendered the initial results reliable, nonetheless, but they told everyone the analysis they went through. And if people thought that that was junk science, they were perfectly entitled to read that, make their own judgment, and not bother investing in the company. But nothing was withheld. So tell me if I'm missing something there. Well, a couple things on that, Judge Watford. So first of all, the matters that you're talking about for public disclosure were disclosed exactly once in a medical journal two and a half years before the start of the class period, three and a half years before the readout of the Cupid II results. It was not disclosed in any document that was directed to investors. It was not disclosed to investors, and it was not disclosed at any point in time that was relevant to the class. In fact, it was disclosed at a time before Celadon even became a public company. So what disclosures to investors were made in which this should have been a part of that? So the disclosure to investors, the findings of the SEC appear to be very, very general. And we have a lot more specific information in the article and the supplement that really get into the weeds. So where is it that they fell down? So there's two things, Your Honor. The supplement, what the supplement did not include, and just to complete my answer to Judge Watford, is any kind of validation or explanation of the methodology. Yes, they said, okay, we took out the four placebo patients that we determined were highest risk or sickest, but they didn't explain why. They didn't explain why that was a reasonable methodology and how that showed that the efficacy results remained correct or remained reliable. And that's important because they did that with other aspects of the CUPID-1 design. So, for example, with the p-value being .2 or 20%, which is a very high threshold for statistical significance, they took care in the CUPID-1 result article, the article itself, to explain why they did it that way. But they omitted, and this is not an actionable omission because it was before the class period, but they omitted in the data supplement any additional explanation or validation of why the sensitivity analysis was correct or why it was supportable. And they omitted, this is during the class period, they omitted any mention of the baseline imbalances or of the sensitivity analysis at all. But somebody looking at that, somebody who's knowledgeable looking at that, at the fact that you took people out of the study after you unblinded it, surely would have reasonable questions about the methodology. Correct, Your Honor, but that's not the question before the panel. The question before the panel is what would a reasonable investor do with that information? And a reasonable investor, I would submit, would not know what to do with that information. I mean, all they said in the article was, we saw some patient imbalances on certain of the criteria, namely VO max and so on and so forth. I mean, I had to hire an expert to explain this to me, right, and to make the allegations in my complaint. No reasonable investor would be able to make heads or tails of any of this. You just had this very complicated chart, and I'm looking at, you know, page ER 36 with this, you know, very complicated set of information. I mean, I'm not saying it's wrong for purposes of the medical journal. If that's true, then how do you, since the statements that an average investor, someone who's not very smart like me in this, would be able to look at, would only look for words like encouraging, you know, good result onto next phase. But why would that be false? So, Your Honor. Why is that misleading if the folks at Celadon believed that the results were encouraging? That wouldn't necessarily be false. Okay. So I believe Your Honor's question focuses on certain statements by Dr. Zibo, the CEO, in press releases. Right. I just want to make sure we're talking about the same thing. Right. And those are the ones that an average investor, somebody who didn't have technical understanding of how scientific studies should be conducted and what the flaws in the study might be, if you're looking for your average investor, those statements are so general that it's hard to say that Celadon didn't believe them. They were putting millions of dollars into the next study. So, okay. So the statements that Your Honor is talking about are the press releases with words like encouraging and validating the results and so on in the press release. I just want to make sure I'm on the same page with Your Honor. Here's the thing about that. So Celadon argued that those were puffery. My submission is that they're not puffery because they're based on criteria. They're based on hard facts. They're based on they're not just corporate boosterism like we're going to have a great year next year or on to the next, you know, great initiative. They're based on very precise, albeit we allege unreliable, results from a clinical trial. So I would suggest that those are not puffery at all. When she says look at these encouraging clinical results, that's not puffery. She's talking about specific clinical results that you can look up, as Judge Watford said. Anyone could look this up if they wanted to. Maybe they wouldn't understand it, but they could look it up. They could hire an expert. Right. But I think what Judge Bivey is getting at is that so fine, she's expressed an opinion, and if you wanted to try to prove that she didn't genuinely hold that opinion, that would be one thing. You have presented not one fact that suggests in any way that she did not sincerely believe that the sensitivity analysis that she did, notwithstanding the flaws in the methodology you allege, you allege one fact that suggests that she didn't really believe that the analysis they did, in fact, did validate the results. Oh, I would disagree with that, Your Honor. Okay. What do you got on that front? Okay. So I would suggest that our complaint has sufficient facts under the PSLRA standards to allege that very thing. What do you got?  So first of all, the sensitivity analysis is suspicious for a number of reasons. First of all, it doesn't satisfy its own methodology at all. That's very strange. That should have been a red flag to Dr. Zito. I'm talking about, okay, so subjectively that she did not sincerely believe that the sensitivity analysis, in fact, validated the results. I think what you would need is some kind of, you know, back channel communication, hey, this is really bad, but let's keep the, you know, the party line out there, even though we all know that this completely undermines what we've done. You'd need something pretty damning like that, wouldn't you, to say that she, subjectively in her head, she did not genuinely believe that the results were still valid? Well, I don't think the standard is whether I have some kind of, you know, smoking gun e-mail. I mean, TELAB says nothing of the sort. It says the opposite. I'm saying what else would you be able to point to? All you've said is that any competent scientist in this field would have to know that this was just junk. That's what you've basically said. No, you're wrong. Okay, well, what else then? Okay, so first of all, there's no disclosure of the baseline imbalances or the sensitivity analysis any time during the class period at all. I think that is suspicious, especially because of the- You're not speaking to what is in Dr. Zito's mind. Maybe you want to move on to something else, but the question I put to you, you have not come up with one fact that says she, in her own mind, did not genuinely believe that the sensitivity analysis validated the results. So what do you have on that front before you try to move on to something else? So let's look at one thing. So Dr. Zito's name is on both documents. It's on the Cupid One article, which, Your Honor, remind the room, was disclosed back in 2011. It's also on the data supplement, which those documents go together. Dr. Zito embraces the article which has the results and proudly touts the results. But apparently she doesn't, you know, our submission is that we have alleged facts that the methodology for the sensitivity analysis is wrong. Those facts have to be taken as true. There are no facts in the record, interestingly, that show otherwise. But aren't you suggesting that given Dr. Zito's experience, given that this is a small company, given that this is her field, she's got a Ph.D. in this stuff, that you're asking that there is a reasonable inference that she knew? Do you have anything beyond that? I don't, and I think that's all we need. I don't see this as an opinion. It's not an opinion question, Your Honor. It's a question of knowledge. Cyanter is a question of knowledge or the deliberate recklessness. It's not a question of opinion under Omnicare. And I think maybe, you know, respectfully, I think maybe the standards may be getting a bit muddled. So we've alleged with specific facts that are backed up by an expert in the field that this methodology was all wet. And what's interesting here and what takes us out of the regal rubric is that there is nothing in the record, either from the company itself or from counsel in the submissions below or even in this court, that goes against that. There's no explanation saying, no, plaintiffs, you don't know what you're talking about. This is why we did it this way, and this is why the sensitivity analysis is totally reasonable. There's nothing on that. It's almost like the sensitivity analysis is almost admitted as being indefensible, which I think is remarkable. And that's one of the things, you know, that takes us out of the regal rubric, which is an important matter before the panel as well. So if one agrees, if the panel agrees that we've sufficiently alleged that the methodology is no good, her name is on the document, so she has to stand by the document, right? I mean, under Howard v. Everix, a panel of this court held that if you sign an SEC filing, you're responsible for what's in the filing. Now, there's no question that she stands behind the Cupid 1 article, so that means she's got to stand behind the Data Supplement 2. I mean, it's almost like the defendants are arguing that, okay, well, she stands behind the 10-K, but she doesn't, you know, necessarily understand the exhibits to the 10-K because that was an online document that didn't get sent out to the shareholders. So I don't think that's really going to work. So she's got to be responsible for both. That's the essence of the argument here. Also, as Judge Hernandez said, we have all of the indicia that have been accepted by courts multiple times in other cases of this variety. Tiny company, 35 employees, this was their only product. I mean, this was her baby, to use a colloquialism. The entire purpose of the company was to get this Midecar thing on the market. She stood to lose a lot of money. She had every motive to get this Midecar thing moving along and to advance it to Cupid 2, even if the — and to paper over, we allege, the unreliable results of Cupid 1. And our stock sale allegations support that as well, we would submit. You have about 30 seconds left. Would you like to reserve your time? Yes. Thank you, Your Honor. Thank you, Your Honor. Good morning, and may it please the Court. Koji Fukumura for the defendants. I'm going to pick up with Scienter. This is a fraud case. They're accusing my client of intending to deceive the investing public and Judge Watford's line of questioning. And it's really — you don't need to go beyond Scienter because there's just no well-plead allegation in this complaint, and I'll describe why. So to adequately allege Scienter, plaintiff must plead a highly unreasonable omission involving not merely simple or even inexcusable negligence, but an extreme departure from the standard of care. So think about that. There are statements that they say are misleading by way of omission because she failed to include in them some information in the study about their observation of a baseline imbalance and sensitivity analyses that they ran. But the only way that becomes actionable is, to Judge Watford's point, it was a highly unreasonable omission, that she knew that these sensitivity analyses, in their words, were a sham. And I'm going to tell you why that's not. She's not alone in this study. The study had 27 principal investigators. The study included some of the most significant cardiologists and cardiovascular surgeons in the country. The chair of the study, Dr. Meryl Jessup, is a former president of the American Heart Association. Dr. Thomas Coppola is the chief of cardiovascular surgery at the University of Pennsylvania. Dr. Daniel Pauly, the chief of cardiology at the University of Florida. These are the authors of the study. These are the people who ran the sensitivity analyses. These are people to whom they say owed no, had no financial allegiance to the company. Now, they've identified a few of the authors and principal investigators, like Dr. Greenberg, who is the chief of cardiology. He's a former president of the Heart Failure Society of America and a director of the Advanced Heart Failure Treatment Program at UCSD. They say, well, you know, he has a stipend because he's on the advisory board. And without more, they say that, you know, he must be in on it. So in order to believe the plaintiff's theory that this sensitivity analysis that was run not to change the study outcome, but just to understand whether or not the baseline imbalances that they observed were a problem. Let's just try to understand it. They're not running a new statistical analysis to get to a new endpoint. The study had an endpoint. They met every single one. They saw the baseline imbalances and said, okay, well, we should probably run some analyses on this and the baseline imbalances, run some sensitivity analyses. They did. To Judge Watford's point, they disclosed it in an online supplement. Is there a point where that disclosure may not be enough? I mean, I know you're arguing that it was. But is it ever not enough? Because the disclosure was disclosed in some obscure publication that nobody's ever going to read anyways. And you can't hide behind it and say, well, we disclosed, we're good. And I think that's what the plaintiffs are arguing. It's a great question. The problem for them is that every single person in the industry, so I'm going to talk about specific other actors. Every person in the industry knows, including the analysts who make the market, including the specialists on the floor of the training, they know where to go to get this information. And it's called clinicaltrials.gov. All the information for clinical trials are in clinicaltrials.gov. If you Google mitochord clinical trial, the very first hit is CUPID-1. If you click into that, scroll to the bottom, it will say publication of results. Click on that, you get right to the American Heart Association, peer-reviewed journal circulation, online. You can just click on the supplementary materials, and out it comes. It takes 20 seconds. And the reason why this is important is they sort of say that we've hit it in the ether. It's literally in the place that everyone would go first. I have it bookmarked in my phone. We do a lot of life sciences work. If I hear about a clinical trial, that's where I go, right? And the idea that we would have to, and the conclusion, by the way, the sensitivity analysis that they ran was that it could not explain, these baseline imbalances could not explain the very positive results in each of the efficacy analyses that were conducted and the additional analyses timed to recurrent events. They hit all of them. Now, he may say, well, in the sensitivity analysis, the group-level analysis was no longer statistically significant. Okay. Again, the point was not to run a new statistical analysis, but I will tell you that the individual analysis was still highly significant and all the timed-to-recurrent-events analyses, which became the endpoint for Cupid 2, were all highly significant. And if you'd like me to go through those points individually, I'd be happy to. So in their brief, they argued that when you conduct a sensitivity analysis, the trial goes from pass to fail. That's wrong. In order to, the success of this trial is defined as follows. Primary endpoint success criteria, efficacy in either the group-level or the individual-level or the outcome analysis, plus at least positive corresponding trend, numeric superiority in all other analyses, no clinical worsening, significant worsening of any of the endpoints. Even when you take out the four patients, you meet it for individual, you meet it for outcome. After the four patients were taken out, how many were left? Well, so it's a great point. There is a limitation to this study, which is it's very small in size, which is why you get in. Thirty-nine total? There's 39 in the Phase IIa portion of this. And the reason the 39 are divided into, I think, four different classes. Correct. There's placebo had 14, you had 14, 8, 8, 9. That gives you less than 10 in each group. Yes. So you took out almost half of those from one of the groups? Right. And it, in what the study out, I'm sorry. How many did that leave in the placebo group? Ten, yeah. I mean, you took four out of the placebo group? Correct. The four sickest patients. Right. And that would have left you with six? Ten. There were 14 in the placebo group. It was larger than the other groups? Yes. Yeah. And what the study out there said is that highly skews in favor of the placebo group. But nevertheless, we're not, again, we're not running a new statistical analysis. The only thing, we have a result. Cupid I met all of its efficacy endpoints. But we're observing that there is an imbalance here between placebo and high dose. So let's just run some analyses. And who ran it? The people I've described. And I didn't even tell you about the other principal investigators, which include the directors or chairs of the cardiovascular surgery or cardiology departments at the University of Chicago, at the Cleveland Clinic, at the University of Iowa, at Methodist Hospital. These are very significant people. And the idea that they would run a sham sensitivity analysis and then present that to the very people, cardiologists and cardiovascular surgeons, who would most likely ferret out a sham analysis is not reasonable. And let me tell you what else is not. Can I just ask you a question in terms of what scientists in this field were saying? Right. So this publication came out, was it 2011? Correct. Was there any point after that where folks in the field said, hey, like these guys are saying, this is a joke? Yeah. Was there any kind of critique like that? No one. Zero. The only time the imbalances, and to be sure, other people raised the fact of the imbalances. When they initiated coverage, right after the company went public in February of 2014, Barclays came out, Credit Suisse came out and said, among other things, look, it looks very encouraging. That's their words, right? We're looking at this study. Yeah, but they were basing that based on your words, were they not? Well, okay, so when we're talking about stock analysts in life sciences, I think it's reasonable to assume that these stock analysts know what they're doing in terms of life sciences. So they did their own work. They may have looked only at the study results and the supplement, and they came to their own conclusion. But the important point is not a single person in this complaint, other than the plaintiff and his unnamed biostatistician, has ever said that this is a sham, this sensitivity analysis is a sham, has ever said, hey, you know, before we say that, we should be concerned about X. No journal article, no document, not a single confidential witness. You did have an article, a critical, just before Celadon announced the results of Cupid II. It's not critical, but I'd love to address that. What it says is, it points out the baseline imbalances, right, that Barclays did and others, and it said it's such a small study, it was such a small study. And if I look at some of these specific metrics, boy, I just don't think the study was powered enough. And again, time and again, it's the first thing in all the disclosures, it was a small study. We're not saying at the end of Cupid I, boy, this works. This brand-new therapy, the first time there's ever been a gene therapy trial for a cardiovascular condition. This really works. No one has said that. Dr. Sable never said that. What she said very clearly were, here are the results, they met their efficacy endpoints, and based on this, we're going to move into Phase II, or really, Phase IIb. You know who else agreed with that? So we have to look at what are the reasonable inferences, the common sense inferences. After the study results came out, Pfizer, Novartis, Johnson & Johnson invested tens of millions of dollars in this company. Is it reasonable to assume that they didn't go and pull the online supplement? Is it reasonable to assume that they didn't pull the study results? Of course not. We know, the company was private at the time, by the way, there's no reg FD issue. They were in their meeting with management, they were there poring over everything. That's a reasonable, common sense conclusion about how the largest pharmaceutical companies in the world are going to act prior to investing tens of millions of dollars. Just on that same point, do you know what scrutiny the FDA does before it? I can't remember the designations of any of those little catch words, like breakthrough or fast track or what, but does the FDA also scrutinize this stuff before? So the FDA, they quoted that you just need to give us a summary before we give you fast track designation, before we give you breakthrough therapy status. And this is another great example of using common sense. There also was an end of phase two meeting. They say, oh, you only have to give a summary. Now, the only question would be, did the FDA, before giving these designations, which we represent more life sciences companies than any firm in the country, and I can tell you my clients would be thrilled if they could skip phase three clinical trials. They would be thrilled if they could get more access to the senior members of the FDA. Of course they looked at it. Of course they looked at the study results and the online supplement. Probably had some questions. Hey, what about this? Hey, principal investigator, Dr. Jessup, what about this? And they got answers. And what was the result of those interactions? On December 11th, fast track designation. In the beginning of 2012, a special protocol assessment after the end of phase two meeting, allowing for the next trial. Now, why in the world, if this was a sham, if this was so obviously a fraud, why in the world would the FDA do any of that? And then for the first time ever, said ER106, granting breakthrough designation to a company for a gene therapy program. Now, why would the EMA, the European Medicines Agency, say, by the way, we might be able to skip phase three and go to marketing in Europe? Those reactions by these sophisticated actors, by Pfizer, Novartis, J&J, MPM Capital, which is the largest private equity firm that invests in life sciences, is that a reasonable response to a sham? Is it reasonable to think that they didn't look at this? Of course not. And so the only thing, there's this sort of mountain, right, of inferences that one could draw from the facts that they allege in the complaint that are very consistent with her belief that exactly what they said. It's a small study, 39 people hit the ball out of the park on each one of these endpoints. There was a baseline imbalance. She's a biochemist, by the way. And I'm not running away from the fact that she was an author, but she was surrounded by people who are cardiologists, cardiovascular surgeons, and they together made this decision. You have to believe that they were in on it, that this was a sham. And I see my time is up. And they just haven't done that. And for that reason, Your Honors, we respectfully request that you affirm the trial court's decision. Thank you. Thank you, Mr. Fukumura. Mr. Goldsmith, I'll allow you a minute. You've consumed most of your time. Thank you. Thank you, Your Honors. Appreciate that. So Mr. Fukumura said a whole bunch of things during his presentation. Many of the facts that he presented were outside the complaint about looking things up on the Internet and so forth, things that I can't frankly speak to, but things that are just not in the record at all about his personal involvement and so forth. I think the court is more than qualified to separate that out. He says that, you know, this fraud was so obvious and a sham. It was a sham, but it wasn't so obvious. You'd have to be able to discern it. That's the whole point. That's part of the thrust of our case, that a reasonable investor, as we've specifically alleged, would not have been able to recognize the issues with the sensitivity analysis. We think that the motive, you know, counsel for Celadon is incredulous that this could have happened. I think it's quite clear. So one of the questions that occurred to me during your opening presentation that I didn't ask is, if the folks at Celadon were aware of the sham, why do they persist in this? Why waste millions of dollars more on a test that is not likely to work in the end? So does this depend on your proof that Dr. Sabo sold stock before the second test came out? It's not that it wasn't necessarily likely to succeed. When we talk about CUPID-2, it's that the risk that CUPID-2 would fail was much greater than the company let on. They could not advance Mitocar to CUPID-2 unless they showed success in CUPID-1. CUPID-1 was a precondition to moving or advancing Mitocar to CUPID-2. You had to get past the first hurdle to get past the second hurdle. And I would suggest that the thing about not having to do Phase 3 was a motivation rather than a proof of innocence. They knew that if they could get to CUPID-2, then they would be able to get to the promised land and become very, very rich and successful. So when they realized that they had these tremendous imbalances, which were so tremendous when one who knows looks at the data, that they very likely drove the efficacy results of CUPID-1. It wasn't just, oh, no, there's a small imbalance. This was a very severe imbalance, and we allege that that actually caused the results. We allege that they had to paper that over with a sensitivity analysis so that they could get to CUPID-2. So the thrust of our case is that it's not that they thought CUPID-2 would fail or they knew it would fail. They wanted it to succeed. Sure, they did. But the risk of failure was far greater than they let on. They knew that it was a huge gamble. This is our allegation. But they didn't disclose the risk adequately to the investing public, to my client and to the class that we seek to represent. That's what this case is about, and that Dr. Szibo knew that that risk was far greater than what was disclosed. That's the core of the case. We certainly are not saying that Dr. Szibo hoped it would fail, knew it would fail, thought it would fail. That would not be a successful claim. I think that answers your question. I think I've gone over. Thank you, Your Honors. We thank counsel for the argument. It was helpful. And with that, the court has completed the oral argument calendar for the day, and we stand adjourned.
judges: Bybee, Watford, Hernandez